U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET





**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 22, 2007**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| RICHARD D. MORGAN, | § | CASE NO. 05-34981-SGJ-7 |
|     DEBTOR. | § | |
| | § | |
| | § | |
| 8400 N.W. EXPRESSWAY, LLC, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 05-3605 |
| | § | |
| RICHARD D. MORGAN, | § | |
|     DEFENDANT. | § | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Before this court is the Adversary Complaint Objecting to Discharge (the "Complaint") brought by 8400 N.W. Expressway, LLC (the "Plaintiff" or "8400 Expressway") and Debtor's Answer to Complaint Objecting to Discharge (the "Answer") filed by Richard D. Morgan (the "Defendant," "Mr. Morgan," or the "Debtor"). This

court has jurisdiction of this matter pursuant to 28 U.S.C.
§§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C.
§ 157(b)(2)(J). This memorandum opinion constitutes the court's
findings of fact and conclusions of law pursuant to Federal Rule
of Bankruptcy Procedure 7052. Where appropriate, a finding of
fact will be construed as a conclusion of law and vice versa.

The Defendant filed his voluntary chapter 7 petition in
bankruptcy on May 2, 2005, so the pre-BAPCPA[1] Bankruptcy Code
provisions apply. The Complaint was filed on August 11, 2005.
Defendant filed his Answer on September 13, 2005. Trial of the
matter commenced on September 18, 2006, and continued on
September 19, 2006, September 20, 2006, September 25, 2006 and
September 27, 2006. The court granted the parties' requests to
submit various post-trial briefing, the last of which requests
was granted in an Order Granting Leave to File Sur-Reply Brief,
entered December 13, 2006.

By the Complaint, the Plaintiff objected to granting of the
Defendant's global discharge pursuant to section 727(a)(2)(A)
(debtor transferred, removed, destroyed, mutilated, or concealed
property of the debtor within one year before the petition date
with the intent to hinder, delay or defraud creditors or an
officer of the estate charged with custody of property), section

---

[1] Bankruptcy Abuse Prevention and Consumer Protection Act of 2005
("BAPCPA").

727(a)(3) (debtor has, without adequate justification, concealed, destroyed, mutilated, falsified, or failed to keep and preserve financial records such that his financial condition or business transactions might be ascertained), and section 727(a)(4) (debtor knowingly and fraudulently made a false oath or account in or in connection with his bankruptcy case).  By his Answer, the Defendant denied all such allegations.  At a pretrial status conference, counsel for Plaintiff announced to the court that the Plaintiff would not pursue the cause of action under section 727(a)(4).  So the court is left to address only the allegations in the Complaint relating to section 727(a)(2)(A) and section 727(a)(3).  Before the court may address those causes of action, however, the court must first turn to certain procedural matters raised by the parties on the eve of trial.

## II.  PROCEDURAL MATTERS

A flurry of eleventh hour, and in some cases thirteenth hour, pleadings have placed several procedural issues before this court, of which the court must dispose before turning to the merits of the Complaint and Answer.  Indeed, the resolution of these procedural matters determines whether, despite the five-day trial held by this court, the court can even consider the merits of the Complaint and Answer.

Claim Objection.  First, on September 17, 2006, Defendant filed Debtor's Objection to Proof of Claim No. 3 Filed by the

Plaintiff, 8400 Expressway.  The next day, on September 18, 2006, the first day of trial of this adversary proceeding, Defendant filed Debtor's Supplement to Objection to Proof of Claim No. 3 Filed by 8400 Expressway (together with the Debtor's Objection to Proof of Claim No. 3 Filed by 8400 Expressway, the "Claim Objection").

   <u>Motion to Dismiss for Lack of Standing.</u>  Relatedly, on September 17, 2006, Defendant filed his Motion to Dismiss Adversary Proceeding Due to Lack of Standing by Plaintiff (the "Motion to Dismiss").  Defendant urged that Plaintiff was not a "creditor" with standing to pursue a discharge objection, pursuant to Section 727(c)(1).  The arguments in this Motion overlap with the arguments urged in the Defendant's Claim Objection.

   It appeared to the court that these pleadings were filed, at least in part, with the purpose to forestall trial on the merits of the adversary proceeding, which, at the time of trial, had been pending for over a year.[2]  Rather than delay trial, and because the court was highly doubtful that these pleadings presented a jurisdictional or other obstacle to the court going

_____

   [2] The purpose of delay was particularly apparent where the parties had already been in litigation before this court, albeit before a different judge, regarding Plaintiff's motion for summary judgment, which was argued and denied, necessitating this trial.  Moreover, per *footnote a* in the Claim Objection, the question of whether Plaintiff was properly a creditor before this court was raised in a deposition as early as January 19, 2006, but Defendant waited until the eve of trial to file his pleadings.

forward with trial,[3] the court ordered that trial on the merits would proceed and that Plaintiff would be permitted an opportunity to respond in writing to the Claim Objection and the Motion to Dismiss. The court further instructed the parties that the court would hold a supplemental hearing on the Claim Objection and/or the Motion to Dismiss after all post-trial briefing had been filed, if the court deemed such a hearing necessary. The court does not find a hearing necessary. The court addresses these two procedural matters below.

## A. Plaintiff's Alleged Claim Against Debtor.

As a preliminary matter, the court will address the basis for Plaintiff's alleged claim against Mr. Morgan – then the Claim Objection and the Motion to Dismiss.

---

[3] The Plaintiff asserted that, by waiting until the eve of trial to file the Motion to Dismiss for Plaintiff's alleged lack of standing (*i.e.*, lack of creditor-status), Defendant should be deemed to have waived that defense, pursuant to Fed. R. Civ. P. 16(e), which requires that all defensive matters must be pled in the pretrial order. However, the question of a party's standing to sue is, fundamentally, a jurisdictional question. *Goldin v. Bartholow*, 166 F.3d 710, 719 (5th Cir. 1999) ("The standing of both parties must be inquired into as part of the Article III jurisdictional inquiry."). Standing to sue is part of the "case or controversy" requirement of Article III, Section 2 of the United States Constitution. *Id.; see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997). A motion to dismiss for lack of standing may be treated as a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). *Mancuso v. Sullivan (In re Sullivan)*, 153 B.R. 751, 754 (Bankr. N.D. Tex. 1993). As a general rule, a litigant generally may raise lack of subject matter jurisdiction at any time in a civil action, even at the appellate level for the first time. *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004). Accordingly, no matter what concerns the court may have with the litigation tactic of an eleventh-hour standing argument, the court believes it is appropriate to consider the substance of the Motion to Dismiss, as part of the court's ruling in this adversary proceeding, and not deny it for lack of timeliness.

Plaintiff timely filed a proof of claim in the above-referenced case on December 30, 2005, which was designated as Claim No. 3 in the Bankruptcy Clerk's Claims Register. In Proof of Claim No. 3, Plaintiff asserts a general unsecured claim against Debtor in the total amount of $2,854,012.82, based upon:

(1) A judgment dated July 16, 2004, obtained by ORIX Real Estate Equities, Inc. ("ORIX"), in a matter styled *ORIX Real Estate Equities, Inc. v. Bordeaux III, L.L.C., et al.*, Case No. CJ-2003-9945, pending in the District Court of Oklahoma County, which judgment declared Bordeaux III, L.L.C. ("Bordeaux") and Mr. Morgan to be in default under a certain promissory note and guaranty, respectively, and to be jointly and severally liable for the indebtedness thereunder in the amount of $7,175,253.92, plus post-judgment interest; the judgment also ordered the liens of ORIX upon certain real property securing the indebtedness to be foreclosed and the real property sold (the "OK Foreclosure Judgment").

(2) A subsequent deficiency judgment dated October 15, 2004, issued by the same Oklahoma court, after the foreclosure sale of the real property mentioned above, which judgment awarded to 8400 Expressway a deficiency judgment against Bordeaux III (*but not also against Mr. Morgan*) in the amount of $2,717,752.82, plus post-judgment interest (the "OK Deficiency Judgment"). The OK Deficiency Judgment also found "that in connection with the sale of the [real estate], ORIX has assigned all its interest under its judgments herein, its bid, and the note, mortgage and instruments executed in connection therewith, including but not limited to the Guaranty of Richard D. Morgan, to 8400 N.W. Expressway, L.L.C."

(3) An order dated February 10, 2005, issued by the District Court of Collin County, Texas, 416th Judicial District (the "Texas State Court Order"), domesticating to the State of Texas the OK Deficiency Judgment, finding that such judgment is entitled to full faith and credit in Texas pursuant to the Uniform Enforcement of Foreign Judgments Act and TEX. CIV. PRAC. & REM. CODE § 35.01 *et seq.* Notably, the Texas State Court Order also provided that 8400 Expressway "has a judgment against [Bordeaux III] *and Richard D. Morgan* for $2,717,752.82 plus post-judgment interest accruing as of October 15, 2004" (emphasis added), even though the OK Deficiency Judgment, by its terms (and in contrast to the OK Foreclosure Judgment), only recites a

-6-

judgment against Bordeaux III.

Additionally, the court notes that the Debtor scheduled Plaintiff on his Bankruptcy Schedule F, "Creditors Holding Unsecured Nonpriority Claims," as having a claim of $3,000,000.00. The claim is described as "guaranty of Bordeaux III debt subject to setoff," and is listed as disputed.

## B. Debtor's Eve-of-Trial Claim Objection.

In his Claim Objection filed on the eve of trial, the Debtor makes three basic arguments against allowance of the Plaintiff's Proof of Claim: (i) There is nothing in the documentation attached to the proof of claim (the OK Foreclosure Judgment, the OK Deficiency Judgment, and the Texas State Court Order) that identifies the Plaintiff as the true claimant. (ii) While the OK Foreclosure Judgment granted judgment against Bordeaux III and Mr. Morgan, the OK Deficiency Judgment was obtained against Bordeaux III only and *not Mr. Morgan*. Mr. Morgan asserts that the OK Deficiency Judgment replaces and supersedes the OK Foreclosure Judgment. (iii) The loan from ORIX to Bordeaux III was, from its inception, intended by the parties to be a non-recourse debt as to Mr. Morgan, and Mr. Morgan was to have no personal liability on the debt except in certain limited circumstances in which Bordeaux III or Mr. Morgan engaged in certain bad acts.

-7-

The Plaintiff filed a Response to Debtor's Claim Objection on October 17, 2006. In its Response, Plaintiff sets forth four grounds upon which this court should overrule the Claim Objection: (a) The Defendant, as a chapter 7 debtor case, lacks standing to object to Plaintiff's claim. (b) The Defendant's challenge to the substance of Plaintiff's claim is barred by the *Rooker-Feldman* Doctrine. (c) The Defendant's challenge to Plaintiff's claim is barred by the Federal full faith and credit statute. (d) The Defendant has misapplied Oklahoma state law with regard to the OK Foreclosure Judgment and the OK Deficiency Judgment.

## C. Debtor's Motion to Dismiss for Lack of Standing.

As part and parcel to the Claim Objection, the Debtor filed a similarly themed Motion to Dismiss the discharge adversary proceeding due to the Plaintiff's alleged lack of standing. In short, the Debtor suggests that there is a genuine issue as to whether the Plaintiff should properly be viewed as a "creditor" in the Debtor's case. If Plaintiff is not, then it would necessarily lack standing to object to the Debtor's discharge. Only the "trustee, a creditor, or the United States trustee may object to the granting of a discharge under subsection (a) of [section 727] of the Bankruptcy Code." 11 U.S.C. § 727(c)(1). The Defendant asserts that because the OK Deficiency Judgment awards to the Plaintiff a deficiency judgment in the amount of

-8-

$2,717,752.82 against Bordeaux III *only*, and makes no such award of a deficiency judgment against Mr. Morgan, the Plaintiff does not have standing under section 727(c)(1) to object to the granting of a discharge because Plaintiff possesses no claim and, therefore, is not a creditor. The Defendant asserts that the OK Deficiency Judgment replaces and supersedes the OK Foreclosure Judgment such that Plaintiff now has only a judgment against Bordeaux III.

**1. With Regard to Plaintiff's Standing (or Lack Thereof), Pursuant to Section 727(c)(1), What is the Significance of the Plaintiff having Filed a Proof of Claim That Has Not Been Conclusively Disallowed?**

Clearly, Mr. Morgan disputes the Plaintiff's claim. The claim is listed as disputed in the Debtor's schedules. And Mr. Morgan lodged an objection to Plaintiff's claim, at the eleventh hour. However, none of this disputedness changes the fact that 8400 Expressway has a "claim" for Bankruptcy Code purposes, which qualifies 8400 Expressway as a "creditor" with standing to object to the Debtor's discharge. The Fifth Circuit has already articulated the test for determining standing in this context, in the case of *Stanley v. Vahlsing (In re Vahlsing)*, 829 F.2d 565, 567 (5th Cir. 1987).

In the *Vahlsing* case, the debtor filed Chapter 7 bankruptcy and listed his sister in his bankruptcy schedules as an unsecured creditor. The debtor's description of his sister's claim stated:

-9-

"Claim for damages resulting from alleged failure to properly manage the estate of [their deceased father]. The claim is unliquidated and disputed." Under the column for "Amount of Claim," the debtor listed "unknown." The sister never filed a proof of claim in the bankruptcy case. However, she did file a Section 727 complaint objecting to discharge, asserting that the debtor failed to provide adequate records from which to determine his financial status. In the complaint, the sister also asserted that she had a claim "reasonably believed to be in excess of $7,000,000" related to the debtor's alleged mismanagement of their deceased father's estate.

Later during the bankruptcy case, the bankruptcy court granted a motion to lift stay to allow the sister to prosecute her claim against the debtor in a surrogate court in New Jersey. There was an evidentiary trial in the New Jersey surrogate court that lasted several months. Ultimately, the trial judge in that matter dismissed the sister's claim entirely, finding that the debtor had acted in good faith in managing their deceased father's estate. The sister did not appeal the judgment disallowing her claim in full.

Later, in the trial on the sister's objection to discharge, the debtor urged that the complaint should be dismissed because his sister was not a creditor and, thus, lacked standing to

object to his discharge. His standing argument did not prevail at the bankruptcy court or on appeal to the district court.

On appeal to the Fifth Circuit, the Fifth Circuit reversed and remanded, finding that the sister lacked standing to prosecute her suit at the time of trial. The Fifth Circuit reasoned that, although a debtor's listing of a party as a creditor in his schedules does constitute prima facie evidence of a party's interest in the case, and although "a party who has not yet proved its claim has the right to oppose discharge [citations omitted], a party whose claim has been *conclusively disproved* cannot object to a debtor's discharge. Only those claims that will be affected by the discharge can file objections." *Id.* at 567 (emphasis added). On the other hand, the Fifth Circuit opined, "A discharge would affect the interests of creditors with disputed claims since they have a chance of prevailing on their claims." *Id*. The court elaborated that, "When . . . a would-be creditor's only claim has been finally dismissed, a discharge will not even potentially affect her interests" and thus she has no standing to prosecute a discharge objection. *Id.* Thus, according to the Fifth Circuit, standing in a discharge action all boils down to whether there is still a chance of the alleged creditor having an allowed claim; if there is still a chance, then the party has standing under Section 727(c)(1). If, on the other hand, the alleged creditor's "claim" has been finally

-11-

adjudicated and disallowed, then it has no standing to prosecute a discharge objection. *See also Andrews v. Cadleway Props., Inc. (In re Andrews),* 239 F.3d 708 (5th Cir. 2001) (in determining that a party had standing as a "creditor" to oppose certain bankruptcy compromises, court noted that "broadest possible definition" of claim is used in the Bankruptcy Code, and even parties with contingent, remote or undetermined rights to payment are to be regarded as creditors until a court finally determines otherwise).

### 2.   Case Law is Fairly Uniform in Holding that Having a Disputed Claim Does Not Preclude a Creditor from Objecting to Discharge.

The Fifth Circuit does not stand alone on this issue.  Case law is unambiguous that a dispute with regard to a creditor's claim does not divest it of standing to pursue a discharge objection. *In re Korte*, 262 B.R. 464, 470-71 (8th Cir. BAP 2001) (upon the debtor's suggestion that the IRS lacked standing to bring an adversary proceeding objecting to entry of the debtor's discharge, court determined that the IRS did hold a claim qualifying it to be "a 'creditor' under [section] 727(c)(1)," even where the debtor disputed that he owed any tax); *In re Holstein*, 299 B.R. 211, 224-25 (Bankr. N.D. Ill. 2003) (the bankruptcy court examined at length the standing issue under section 727, declining to examine the merits of a creditor's claim in order to find standing; the debtor had hotly contested

-12-

the creditor's claim, but the court observed that "[s]ince the holder of a disputed claim is a 'creditor,' . . . the creditor has standing to seek denial of the debtor's discharge notwithstanding the dispute"); *In re Hermanson*, 273 B.R. 538, 545 (Bankr. N.D. Ill. 2002) (finding that an argument that, because a creditor's debt was listed in the debtor's schedules as disputed the creditor had no standing, was without merit); *Geisler v. Pensegrau (In re Pansegrau)*, 180 B.R. 468, 476 (Bankr. N.D. Tex. 1995) (finding that a creditor who had obtained a take-nothing judgment on his claim in state court such that all of his claims against the debtors were barred by res judicata did not have standing to pursue a section 727 cause of action because he was not a creditor).

In summary, Mr. Morgan's late maneuver before trial, in filing the Claim Objection, does not deprive 8400 Expressway of standing to prosecute the discharge objection. Mr. Morgan has only deprived 8400 Expressway of its "deemed allowed" claim. 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f). Plaintiff will have the opportunity to litigate the validity of its claim in the contested matter to which the Claim Objection gives rise.[4] But,

---

[4] Mr. Morgan, no doubt, desired for this court to take things in a different sequence than is contemplated herein, and focus on the Claim Objection first, and hopefully come to the conclusion that the discharge objection must not go forward (because 8400 Expressway's claim is either not legitimate or is of questionable validity). Unfortunately for Mr. Morgan, timing is "not on his side" in this situation. 8400 Expressway had a deadline for objecting to discharge (which it met when it filed its Complaint in August 2005). The trustee and parties-in-interest do not have a deadline for filing

-13-

"a party who has not yet proved its claim has the right to oppose discharge." *Vahlsing,* 829 F.2d at 567. For these reasons, this court denies the Motion to Dismiss.

## D. Returning to the Claim Objection.

For the reasons stated in the previous section, the pending Claim Objection does not defeat 8400 Expressway's standing to prosecute the discharge objection. Moreover, the court does not believe it is necessary or appropriate to adjudicate the eleventh-hour Claim Objection prior to ruling in this discharge adversary proceeding. The parties may request a setting on the Claim Objection and the court will address it in due course.

---

claim objections in a chapter 7 case. Nevertheless, if the Debtor seriously thought Plaintiff's claim could be eliminated with a claim objection (and, perhaps, Plaintiff's standing defeated in this Section 727 action), the court wonders why Debtor did not file his Claim Objection sooner than eight and one-half months after Plaintiff filed its proof of claim and thirteen months after the Complaint was filed—or at least sooner than the day before trial. Moreover, it occurs to this court that denial of 8400 Expressway's claim against Mr. Morgan (if the Claim Objection ultimately goes forward), is not at all a certainty or likelihood. Not only has 8400 Expressway raised preclusion issues (in its Response to Claim Objection) that deserve weighty consideration, but, even if the prior judgments and litigation involving these parties do not conclusively establish Plaintiff's claim against *Mr. Morgan* (because of the omission of Mr. Morgan's name in the OK Deficiency Judgment), certain Oklahoma case law suggests there are certainly other ways for 8400 Expressway to establish continued guaranty liability against Mr. Morgan. *See Riverside Nat'l Bank v. Manolakis*, 613 P.2d 438, 440 (Ok. 1980) (a guarantor's obligation for a debt depends upon the terms of the guarantee agreement and the guarantor's liability may survive, even where the creditor omits to seek a deficiency judgment). The court understands that Debtor takes the position that the guaranty was nonrecourse, but the court observes that it is not at all obvious that the guaranty was nonrecourse. *See* Plaintiff's Exh. 6, inter alia, p. 107, ¶f. These are all issues (possibly) for another day.

**E.**   **One Last Procedural Matter:   The Motion to Intervene**

ORIX filed a Motion to Intervene in this adversary proceeding on September 27, 2006, requesting permission to intervene in the discharge action "in the event the Court determines, as Defendant alleged, that the assignment to Plaintiff 8400 N.W. Expressway, L.L.C. ("Plaintiff") as set forth in the Judgment . . . was ineffective and caused Plaintiff to not be a creditor.  . . . In the event that the Court concludes that Plaintiff lacks standing to bring this adversary proceeding because it was not an assignee of ORIX with respect to the Judgment, then ORIX requests that it be allowed to intervene in the action against the Defendant.  Otherwise ORIX requests that this Motion be considered moot or withdrawn."  Motion to Intervene [Docket Entry #57], p.2.

By way of background, one of the numerous arguments that the Debtor made in the Claim Objection and the Motion to Dismiss for Lack of Standing was that there has never been any proof presented of the assignment by ORIX to 8400 Expressway of the claims ORIX had against Bordeaux III and Mr. Morgan pursuant to the OK Foreclosure Judgment, the OK Deficiency Judgment and the Texas State Court Judgment (and the loan documents supporting same).

This court does not believe it is necessary to make any finding at this time regarding the existence or validity of the

assignment.  Proof of the assignment is an issue that may be litigated in connection with the Claim Objection.  However, at this juncture, there is a proof of claim on file in the name of Plaintiff, 8400 Expressway, in which it swears that it holds a $2,854,012.82 claim against the Debtor.  As previously mentioned, this proof of claim, initially, was prima facie evidence of the claim of 8400 Expressway.  11 U.S.C. § 502(a); Fed. R. Bankr. Pro. 3001(f).  The Debtor has objected to the claim, disputing many elements of it, including whether there has been a valid assignment from ORIX to 8400 Expressway.  Plaintiff will have the opportunity to litigate the validity of the assignment and other aspects of the claim in connection with the Claim Objection. But, "a party who has not yet proved its claim has the right to oppose discharge." *Vahlsing,* 829 F.2d at 567.

In summary, 8400 Expressway is to be considered a "creditor," as defined in the Bankruptcy Code, with standing to prosecute the Section 727 action.  The fact that there is a dispute with regard to its assignment from ORIX is irrelevant for purposes of its ability to proceed at this time in the discharge adversary proceeding.  Since the court believes there is no need to make a finding at this time with regard to the validity of the assignment (and the court is making no such finding), the Motion to Intervene is denied as moot.

### III.   OBJECTION TO THE DISCHARGE

Finally, the court will reach the merits of this dispute.

### A.   Summary of Factual Allegations and Court's Conclusions.

As described in detail below, the Debtor has been actively
engaged in real estate acquisition, development and related
business activities for many years.  At trial, a tremendous
amount of complex evidence was submitted over five days regarding
the Debtor's prior real estate transactions, dating back to
approximately 1989, including the Debtor's involvement with
various single-asset real estate projects through certain limited
liability companies and partnerships.  The picture that Plaintiff
tried to paint throughout its presentation was:  (1) with regard
to the Debtor's *business* transactions, the Debtor, through the
creation of an intricate web of entities holding real estate
interests and borrowing money, has concealed or transferred his
property with intent to thwart creditors; and (2) with regard to
the Debtor's *family*, Debtor, through a premarital agreement and
transactions with his wife and family trusts, has concealed,
transferred or otherwise put out-of-reach nonexempt property with
intent to thwart creditors.  Additionally, the Plaintiff also
attempted to establish that the Debtor, without any
justification, has destroyed, concealed or otherwise obfuscated
information pertaining to his historic real estate dealings in a
manner that rises to the level of failing to keep financial

-17-

records from which the Debtor's "financial condition or business transactions might be ascertained."

With regard to the *business* transactions, the fact that the Debtor happened to transact significant real estate acquisitions, developments, borrowings and consulting arrangements, over many years, in separate legal entities, is certainly not inherently sinister or suggestive of an intent to thwart creditors. There were certain transactions described at trial and discussed later herein (*e.g.,* the various Gainesville Mall transactions and TacCo Debt Consolidation) that may, if separately challenged, prove to be avoidable, as constructively fraudulent, pursuant to Section 544 or 548 of the Bankruptcy Code. There was certainly some smoke there, and possibly fire. However, Plaintiff has failed to show, by a preponderance of the evidence, that Debtor had any actual intent to hinder, delay, or defraud with respect to such transactions, as required by Section 727(a)(2).

Additionally, with regard to the Debtor's transactions involving his *family*, although there may have been ownership or transfers of property in or to Mrs. Morgan and family trusts in the months and years preceding the bankruptcy filing (some of which transfers may even be avoidable as constructive fraudulent transfers under Sections 544 or 548; again, some smoke and possibly some fire), Plaintiff has likewise failed to show by a preponderance of the evidence that Debtor made transfers with the

-18-

requisite intent to hinder, delay, or defraud creditors that is required by Section 727(a)(2). In all situations, the Debtor has given reasons for transactions that seemed credible and not designed to thwart creditors or in the nature of impermissible pre-bankruptcy planning. Moreover, many of these transactions were relatively insignificant - which, in the court's mind, bears upon the issue of intent and whether the Debtor was really concerned about creditors when engaging in them.

Finally, the court has concluded that the Plaintiff has failed to "connect the dots" in a way that establishes that there was either a failure to keep records that was not justified under all the circumstances, or that was relevant to the *Debtor's* financial condition or business transactions. Any records not produced or preserved by the Debtor pertained to separate defunct entities, not to the Debtor, and the assets of such entities were long ago foreclosed upon.

The court will address the evidence pertaining to the Debtor's various business and family transactions below and then apply Section 727(a)(2) and (3) accordingly.

## B.  The Debtor's Personal/Family Situation.

The Debtor is married to Maria Blackburn Morgan, who is not a debtor in bankruptcy. He is 67, she is 51, and they married in 1994. Between the two of them, they have eight children:  Mr. Morgan has six and Mrs. Morgan has two. At the time of trial,

-19-

Mr. Morgan's 16-year-old son lived with the Morgans, and the Morgans were assisting one of her children and one of his children with college tuition and expenses.

Prior to his marriage to Maria Morgan, and more than 10 years before he filed his Chapter 7 bankruptcy case, Debtor and Mrs. Morgan entered into an Agreement in Contemplation of Marriage (the "Marital Agreement," Defendant's Exh. 9), dated October 21, 1994. The Marital Agreement was filed of public record in the office of the County Clerk of Dallas County, Texas, on November 4, 1994, at Document No. 94215-02627 through 02369. The Marital Agreement provided, among other things, that any property that was acquired by Mrs. Morgan after the date of the agreement and her marriage to Debtor would be owned by her as separate property and not as community property. The Marital Agreement also described certain separate property that Mrs. Morgan owned before her marriage to Debtor and provided that such property would retain its separate character. The Marital Agreement also provided that jointly held property acquired by Debtor and Mrs. Morgan during marriage would be owned by them as joint property with the right of survivorship.

Mrs. Morgan came to the marriage with significant assets of her own. For example, she owned a house on Holly Tree Drive in Dallas, Texas, in which the couple currently resides, which she

received in her divorce from her former husband, Mr. Blackburn.[5] Mrs. Morgan also received approximately $65,000 of profit sharing and individual retirement accounts in her divorce settlement, which she kept invested in a separate account, until taking funds out in 2001 and 2002, when Mr. and Mrs. Morgan fell into financial trouble and needed to dip into these funds to support their life expenses. These funds were purposefully segregated during the Morgans' marriage and Mr. Morgan never asserted an interest in them.

Mr. Morgan testified[6] that there were two and no other purposes for the Marital Agreement: (1) at the time of entering into it, he was under an IRS lien for approximately $200,000 for shadow income from Southmark Corporation, his former employer, and he wanted to protect Mrs. Morgan from that, and (2) he wanted to create a way that would allow Mrs. Morgan to create some wealth of her own.

The Plaintiff seems to believe there is something inherently suspect in the marital arrangements. But the court does not view it this way. Rather, it is clear that this is a blended family, a later-in-life-marriage for both husband and wife, and each spouse wanted to provide for their children equitably. No doubt,

---

[5] The court takes judicial notice of the Schedules filed by the Debtor in this case that show this property has a fair market value of $550,000 with secured claims against it of $440,000.

[6] The court notes that Mr. Morgan, at all times during trial, seemed a credible, frank witness.

too, that each spouse sought to protect themselves in the unhappy event of another divorce.

## C.  The Debtor's Real Estate Business Endeavors.

Prior to 1989, the Debtor was employed as President of the Retail Division of the now-defunct Southmark Corporation (itself a former debtor in the Bankruptcy Court for the Northern District of Texas).

Then, from approximately 1989 to 2001 or 2002, the Debtor was self-employed, and conducted business through an entity known as Tara Group, Inc. ("Tara Group"), which he 100% owned, indirectly through other companies later identified herein. Through the Debtor's Tara Group companies, the Debtor controlled millions of dollars of assets.

In particular, during the period from 1994 through approximately 2001, Debtor was actively involved in the acquisition, development, and management of several real estate projects, primarily commercial shopping centers, through essentially single-asset, single-purpose companies.  The largest and most significant real estate projects in which the Debtor was involved were highly leveraged commercial projects in Ohio (*i.e.,* "Lordstown" and "261, LP"), Rhode Island (*i.e.,* "Warwick"), Florida (*i.e.,* "Volusia"), and Oklahoma (*i.e.,* "Bordeaux III"). Specifically, the Debtor would form separate companies and borrow funds from non-institutional lenders ("Equity Lenders"), such as

American Realty Trust, Inc. ("ART"), NLP Equity Lending I, Ltd.
("NLP"), National Operating, LP ("NOLP"), One RealCo Corporation
("RealCo"), Basic Capital Management ("Basic"), Regis Properties
("Regis"), and American Realty Investors, Inc. ("ARI"),[7] which
funds were either invested in a particular company for the
owner's "equity" for a real estate project, in order to qualify
for project financing from acquisition and development lenders,
or the Equity Lender funds were used to pay certain operating,
development, or other expenses incurred by the single-asset
companies after their acquisitions of real estate.  The Debtor
was directly obligated on or personally guaranteed loans from the
Equity Lenders, as well as on numerous acquisition and
development loans related to his many separate single asset real
estate companies.

## D.  The Eventual Decline of Debtor's Real Estate Business.

Debtor's real estate activities substantially declined in
2001 after two significant transactions failed to close.  Of even
greater impact, during the period from 1999 through 2003, most of
the real estate projects that were owned by the Debtor's
companies were either foreclosed, conveyed to lenders in lieu of
foreclosure, or sold to pay loans associated with such projects

---

[7] Debtor was at one time a director of ARI.  ARI is managed indirectly
by an entity owned by Gene E. Phillips, the chairman of the former
Southmark Corporation.  The Debtor was asked to resign from ARI in
2001 because several loans which ARI had made to Morgan-related
entities were in default, and also due to Mr. Morgan's overall
financial condition.

and, thus, the various companies that had held the real estate were defunct. Bordeaux III, the project to which Plaintiff's alleged claims relate, was the last project to go into foreclosure. As previously mentioned, Debtor had personally guaranteed most of the acquisition and development debt associated with these projects and he, therefore, incurred significant liability on account of the projects and any loan deficiencies remaining after foreclosure, deeds-in-lieu conveyances, or sales of those projects. In addition, Debtor remained liable on the balances due on the "equity" loans obtained from the Equity Lenders. Debtor listed aggregate debts approximating $37 Million on his bankruptcy Schedules on account of the various loans on which he was liable.

    The failure of Debtor's real estate projects and other business interests materially reduced Debtor's personal income. Debtor and his wife reported total income of $255,237 on their 2001 federal tax return. However, they reported only $129,661 as total income on their 2002 federal income tax return, $58,266 of which was reported as income from the liquidation of their individual retirement accounts and pensions. The testimony at trial revealed that during the time frame between 2002 and 2003, the Morgans were in such financial straits that Mrs. Morgan obtained a part-time job at a retail clothing store, The Gap. See Defendant's Exhibit 2, the Morgans' 2003 tax return.

As a result of the loss of most of the Debtor's real estate investments, in late 2001 or early 2002, Debtor closed his office, terminated the employment of his assistant, and stored most of his various companies' books and records in a rental storage unit.

**E. The Debtor's Schedules and Statement of Financial Affairs.**

The Debtor appears to have quite candidly disclosed in his Schedules his stock and other equity interests in the various corporations, partnerships or joint ventures through which he has owned and/or operated real estate (collectively, the "Scheduled Entities") as follows: (a) Morgan/Blackburn Family Leasing, LLC, d/b/a Real Estate Problem Solvers ("Family Leasing"); (b) Warwick Summit Square, Inc. ("Warwick"); (c) Gainesville Real Estate, LLC ("GRE"); (d) Tara Group, Inc. ("Tara Group"); (e) Tara Management, Inc. ("Tara Management"); (f) Lordstown, LP ("Lordstown"); (g) 261, LP; (h) Blue Tees Beverages, Inc.; (i) DL Associates I, Inc.; (j) Tara Summit Square, Inc.; (k) Bordeaux Investments, Inc.; (l) Bordeaux Investment One, Inc.; (m) Crocket Trace, LLC; (n) Bordeaux Investment Two, LLC; (o) Bordeaux III, LLC; and (p) Volusia, LP. All entities except Family Leasing show a "$0" value, and Family Leasing shows a $20,000 value.[8]

---

[8] The Debtor also disclosed in his Statement of Financial Affairs the following additional 16 businesses (besides the 16 listed above) in which he was an officer, director, partner, or managing executive, or in which he owned 5% or more of the voting or equity securities,

**F. The CabelTel (a.k.a. Greenbriar) New Endeavor.**

In September 2003, Debtor started a new endeavor, when he and his Tara Management, Inc. began providing employee and consulting services, respectively, to Greenbriar Corporation ("Greenbriar"), now known as CabelTel International Corp. ("CabelTel") (hereinafter this entity will sometimes be referred to as "Greenbriar/CabelTel"). Debtor is currently (or at least at the time of trial was) still employed with Greenbriar/CabelTel. Greenbriar/CabelTel is a publicly held corporation whose principal office is in Farmers Branch, Texas. Greenbriar/CabelTel is engaged in a number of different businesses, including the ownership and management of the Gainesville Mall in Gainesville, Cooke County, Texas. In fact, the evidence was that Debtor's employment with Greenbriar/CabelTel arose directly from his efforts in locating and closing the acquisition of this Gainesville Mall, which is described in greater detail below.

The evidence showed that the Debtor's personal earnings from his employment by Greenbriar/CabelTel are currently deposited directly into a Family Leasing bank account each month.

---

within six (6) years prior to the commencement of his bankruptcy case: Partners Capital, LP; MN Capital, Ltd.; Donna Lynn Associates; Donna Lynn Associates, Ltd.; DL Associates, LP; BB Morgan Family, LP; SA Blackburn Family, LP; FICOR, LLC Majestic Hotel Corp.; One Realco Hotel Investors, Inc.; Transcontinental Majestic Hotel Corp.; TCI Belmont, Inc.; TCI Surf, Inc.; TCI Brompton, Inc.; Art Williamsburg, Inc.; and KC Airport Hotel, Inc.

**G.  Alleged Transfers Implicating Section 727(a)(2)**

    1.  <u>Transactions (1) Involving the Approximately 41.7-Acre
Gainesville, Texas Outlet Mall ("Gainesville Mall") and the
Surrounding Approximately 82 Acres of Land ("Gainesville Land");
and/or (2) Implicating TacCo Financial, Inc. ("TacCo").</u>

    Between July 31, 2003 and the May 2, 2005 Petition Date, a

complex series of transactions took place involving an outlet

shopping mall and surrounding land in Gainesville, Texas, and

also involving:  (a) Greenbriar/CabelTel, the Debtor's current

employer, and, in some cases, (b) TacCo, an entity that bought

approximately $15 million of the Equity Lender debt against the

Debtor, and happens to be the single, largest shareholder of

Greenbriar/CabelTel.[9]  It is significant to the court that both

Greenbriar/CabelTel and TacCo are "friendly" to the Debtor.[10]

While, perhaps, technically not "insiders" of the Debtor, as

defined in Section 101(31) of the Bankruptcy Code,

Greenbriar/CabelTel and TacCo are significantly influenced, if

not controlled, by Gene Phillips, with whom the Debtor has been

friendly since the days that they were both instrumental figures

at Southmark Corporation.

        (a)  <u>The Gainesville Mall and Land Transaction, as
Originally Contemplated.</u>  On July 31, 2003, the Debtor's wholly
owned direct subsidiary Tara Group, through which the Debtor had

---

[9] TacCo does not have any employees but is managed by a Mr. Ken Joines,
a person who consults with Gene Phillips and manages other private
companies owned by Gene Phillips or his family trusts.  Evidence
suggested that Mr. Joines obtains management direction for TacCo from
Mr. Phillips.

[10] See Plaintiff's Exh. 38.

conducted his real estate business for many years after leaving Southmark Corporation, and which had been largely wound down by this point in time, as a result of foreclosures and other losses of most of the real property owned by its numerous subsidiaries, entered into a Real Estate Sale Agreement, as purchaser, with Gainesville Factory Shops Limited Partnership, as seller, for Tara Group to purchase 124.27 acres of property situated in Gainesville, Texas that, in the aggregate, constituted the Gainesville Mall (approximately 41.7 acres) and Gainesville Land (approximately 82 acres). Plaintiff's Exh. 138. There was no evidence to suggest that Gainesville Factory Shops Limited Partnership, the original seller, was an insider or related in any way to the Debtor, CabelTel/Greenbriar, TacCo, nor to any of the other cast of characters in this adversary proceeding. The contemplated purchase price for the aggregate property was $6,400,000, subject to certain adjustments and prorations. Thus, the Gainesville Mall and Land transaction, as originally drafted, was contemplated to be a deal in which the Debtor's wholly owned corporation Tara Group would be the owner of the Gainesville Mall and Gainesville Land. After some hard times, Tara Group would be up and running again in the real estate business.

     (b)  <u>Enter GOM (Greenbriar/CabelTel's Subsidiary) onto the Scene, as the Ultimate Purchaser of the Gainesville Mall and the Gainesville Land: Aggregate 124.27 Acres.</u> On August 10, 2003, a mere 10 days after execution of the original Gainesville Mall and Land contract, and before the Debtor started his employment/consulting relationship with Greenbriar/CabelTel, Tara Group, as Seller, and GOM (Greenbriar/CabelTel's wholly owned subsidiary), as Purchaser, entered into a Real Estate Sale Agreement for the conveyance of the Gainesville Mall and Gainesville Land to GOM for a purchase price of $6,719,600. Plaintiff's Exh. 69. Tara Group had not closed on the Gainesville property yet, when it entered into this agreement with GOM, but merely represented it was under contract to purchase it. Thus, from the document trail, it would appear as though Tara Group was going to purchase the Gainesville Mall and Gainesville Land and flip it to GOM for a quick $319,999 profit.

     However, the evidence reflects that in September 2003, the Debtor started his employment and consulting relationship with Greenbriar/CabelTel. And the further evidence reflects that, despite this August 10, 2003 document between Tara Group and GOM, Tara Group subsequently assigned, on December 10, 2003, its full interest, as purchaser under the original contract, to GOM. Thus, GOM (not Tara Group) subsequently closed under the original Gainesville Mall and Land contract and, thus, GOM acquired directly from Gainesville Factory Shops Limited

-28-

Partnership the Gainesville Mall and Gainesville Land, by deed dated December 11, 2003.  Plaintiff's Exhs. 68 & 75.

As further explanation for how it was that GOM, and not Tara Group, ended up acquiring the Gainesville Mall and Land, the Debtor testified that, although he had initially attempted to acquire the Gainesville Mall through Tara Group, he was unable to complete the transaction due to his lack of financial resources and financing at this time (this is certainly plausible given what the Debtor's financial situation had come to look like by 2003).  The Debtor then arranged for Greenbriar/CabelTel (through its subsidiary GOM) to acquire the property, and he supervised the closing of the acquisition by GOM.  As a result of those efforts, Debtor received (i) 170,000 warrants for shares of Greenbriar/CabelTel's common stock, (ii) options to acquire 40,000 shares of Greenbriar/CabelTel's common stock, (iii) employment with Greenbriar/CabelTel, and (iv) a consulting arrangement for his Tara Management, Inc.  Debtor also received, as a result of his efforts, (v) 200,130 shares of Greenbriar/CabelTel's common stock (Plaintiff's Exh. 63), ownership of which was either conveyed to Warwick or Warwick's subsidiary, GRE - the evidence was inconsistent, but it is probably irrelevant since the Debtor had control of both[11] - and, as further explained below, (vi) the right to receive approximately 42 acres of the surrounding Gainesville Land.[12]

---

[11] Warwick is the sole member of GRE (GRE is a limited liability company).  Warwick is owned by a Partners Capital, L.P., which is 80% owned by Tara Group, Inc., which is 100% owned by Debtor.

[12] The Debtor has testified that, at the time Tara Group assigned its purchase contract to acquire the Gainesville Mall and Land to GOM, the Debtor actually expected to receive not 42 acres but 82 acres of the surrounding Gainesville Land (78 acres on a "South Parcel" and 4 acres on a "North Parcel," for a total of 82 acres).  However, the Debtor (through GRE) ended up receiving only 42 acres.  The discrepancy between 42 and 82 arose because the Debtor and Greenbriar/CabelTel subsequently entered into an oral gentlemen's agreement that the 78 South Parcel would be split, with GRE to receive only 38 acres and Greenbriar or GOM to retain 40 acres.  The Debtor testified that he agreed to leave 40 acres of the South Parcel behind with Greenbriar/CabelTel because it was his purpose and intent as a consultant with Greenbriar/CabelTel to add value to Greenbriar/CabelTel, and he agreed to this out of fairness to Greenbriar/CabelTel.  It is not clear when the oral gentlemen's agreement was reached, but it was "pretty much decided" by September 17, 2004, according to the Debtor's testimony.

There is no evidence in the record regarding what sort of equity Tara Group might have had in the Gainesville Mall and Land, had it been the one to acquire it (presumably not much, since Debtor had little liquidity at this point in time to contribute equity).  There is also no evidence as to what the exact value was of the Greenbriar/CabelTel warrants, options, common stock, and the 42 acres of Gainesville Land, and the employment/consulting arrangements[13] that the Debtor received in lieu of the entire Gainesville Mall and Land.

(c)  <u>GOM's Subsequent Conveyance of the Gainesville Mall (41.7 acres) to an Entity Controlled by the Debtor Called Gainesville Property, LP.</u>  Eight months after GOM's closing on the acquisition of the Gainesville Mall and the surrounding Gainesville Land, by a deed dated August 11, 2004, GOM conveyed the 41.7 acres of land constituting the Gainesville Mall to an entity called Gainesville Property, LP.  Plaintiff's Exh. 76.  The consideration recited for the transfer was $10.  Thus, Gainesville Property, LP, which, testimony indicated, is a single purpose entity created to own the mall in connection with Greenbriar/CabelTel's refinancing of the mall in August 2004, became the new owner of the mall.  Who is Gainesville Property, LP?  It is a limited partnership, governed by an Agreement of Limited Partnership dated July 13, 2004 (Plaintiff's Exh. 42) in which Gainesville Partners, LLC signed as the 2% general partner (signatory was the Debtor), GRE signed as a 49% limited partner (signatory was the Debtor), and GOM signed as a 49% limited partner (signatory was a Gene Bertcher; the court notes that GOM contributed most of the original capital for this entity, according to the partnership agreement).  And who is Gainesville Partners, LLC, the 2% general partner of Gainesville Property, LP?  It is a limited liability company governed by an LLC Operating Agreement dated July 13, 2004 (Plaintiff's Exh. 43) which indicates that the sole member was GRE.

In summary, it appears that, as of August 11, 2004, pursuant to a refinancing undertaken by Greenbriar/CabelTel, the 41.7-acre Gainesville Mall was contributed to an entity essentially controlled by the Debtor and 51% owned by entities owned/controlled by the Debtor.

(d)  <u>TacCo Debt Consolidation.</u>  A couple of weeks later, on September 1, 2004, the Debtor and certain of his now-mostly-defunct businesses - Warwick; Lordstown; Volusia, LP;

---

[13] The court is aware that the consulting agreement was $180,000 per year for three years.

Bordeaux Investments Two, LLC; and Partners Capital, Ltd. (collectively, the "Business Borrowers") - entered into a Consolidation and Modification Agreement (the "TacCo Consolidation Agreement") with TacCo. As mentioned previously, TacCo is perhaps technically not an "insider" of the Debtor, as defined in Section 101(31) of the Bankruptcy Code, but was/is apparently friendly with the Debtor. As previously indicated, Gene Phillips is associated with TacCo (and Gene Phillips is associated with Greenbriar/CabelTel). As earlier indicated, the Debtor and Gene Phillips go back a long way with one another - having ties at least as far back as Southmark Corporation. In any event, it seems that TacCo bought up a significant amount of the indebtedness held by the Equity Lenders[14] against the Debtor and against the Debtor's defunct real estate entities. The TacCo Consolidation Agreement recited that: (i) Bordeaux Investments was indebted to NOLP on a promissory note dated January 7, 1997, in the original principal amount of $2,725,000, the current balance of which was $2,663,915; (ii) Lordstown was indebted to ART on a promissory note dated March 19, 1999, in the original principal amount of $2,000,000, the current balance of which was $4,183,620; (iii) Warwick was indebted to NLP on a promissory note dated May 8, 1998, in the original principal amount of $836,000, the current balance of which was $1,865,600; (iv) Volusia was indebted to ARI on a promissory note dated August 20, 2001, in the original principal amount of $200,000, the current balance of which was $134,884; (v) the Debtor was indebted to Basic for $1,629,918 as of October 25, 2001; (vi) Partners Capital was indebted to American Reserve Life Insurance Company on a promissory note dated August 20, 2000, in the original principal amount of $1,000,000, the current balance of which was $673,420; and (vii) the Debtor was indebted to RealCo on a promissory note dated September 27, 2001, in the original principal amount of $67,184, the current balance of which was $396,171. The TacCo Consolidation Agreement recited that TacCo was the current owner and holder of all such debts and all security therefore.[15]

Under the TacCo Consolidation Agreement, the Debtor and the Business Borrowers agreed to consolidate all such debts and signed a "Replacement Promissory Note" payable to TacCo in the

---

[14] It appears that many of the original Equity Lenders were Gene Phillips-influenced or controlled entities as well.

[15] Note that TacCo also held a claim on which Warwick was liable, in the amount of $1,865,000, at the time of acquiring the various notes listed above.

principal amount of $15,000,000 (the "Consolidated Note").[16]
Under the TacCo Consolidation Agreement, Debtor pledged his
interests in the Greenbriar/CabelTel stock options and warrants
as security for such loans.  GRE (which, recall, was owned by
Warwick - and the stock of Warwick was already pledged to TacCo
by reason of TacCo's acquisition of the NLP loan), pledged, as
security for the consolidated loan, its interests in the
Greenbriar/CabelTel stock and granted TacCo a deed of trust lien
on the 42 acres of Gainesville Land GRE received.

          (e)  <u>GOM's Conveyance of 2.307 Acres of the Surrounding
Gainesville Land to an Entity Called Gainesville Hospitality.</u>
With regard to the approximately 42 acres of Gainesville Land
that the Debtor (through GRE) was to receive, for his efforts in
bringing the Gainesville deal to CabelTel/Greenbriar, it appears
that it took several months for GOM to actually deed the land
over to GRE - it is not clear from the evidence why, except the
evidence was that there was a refinancing of the Gainesville
property in August 2004, at which point in time GOM owned the
Gainesville Land free and clear of any liens, so the court
presumes that it was only at this point that GOM was free to
honor its bargain with the Debtor, that he would get 42 acres of
the surrounding Gainesville Land, and execute deeds.  However,
before deeds were executed for the benefit of GRE, GOM conveyed
**2.307** acres of the Gainesville Land, for the benefit of GRE, to
an entity called Gainesville Hospitality, by deed dated August
25, 2004.  Plaintiff's Exh. 36 & 77.  The consideration recited
for the transfer was $257,333.55.  There was no evidence to
suggest that Gainesville Hospitality was an insider or related in
any way to the Debtor, nor to GOM, CabelTel/Greenbriar, TacCo,
nor to any of the other cast of characters in this adversary
proceeding.  GOM agreed to pay all the net proceeds from the sale
(apparently $213,000) to GRE.  However, TacCo intervened and
demanded that the Debtor have the proceeds from the sale, that
otherwise would have gone to GRE, transferred to TacCo, to pay
down a Warwick loan held by TacCo; consequently the Debtor
instructed the title company to transfer $213,000 of proceeds
that GRE was due to receive to TacCo.  Note that GRE was not
liable on any indebtedness to TacCo.  However, Warwick was, and
Warwick is, the parent of GRE.  Thus, it would appear that TacCo,
which, at the time, held significant indebtedness against the
Debtor and Warwick, which indebtedness was in default, was
seizing upon an opportunity to collect on an asset that was

---

[16]Following execution of the Consolidated Note, all of the borrowers under
the Consolidation Note became obligated to TacCo for the full $15 million
owed thereunder.

coming into the indirect possession of the Debtor and Warwick (*i.e.,* cash that was coming into the possession of a subsidiary of Warwick).

     (f)  <u>GOM's Subsequent Conveyance of Part of the Surrounding Gainesville Land to GRE.</u>  GOM finally conveyed **1.686** acres of the 42 acres of the Gainesville Land to which Debtor was entitled to GRE, by an amended deed dated September 17, 2004. Plaintiff's Exh. 71.  The consideration recited for the transfer was $10.  GOM subsequently conveyed another **17.163** acres of the Gainesville Land to GRE, by deed dated October 27, 2004. Plaintiff's Exh. 72.  The consideration recited for the transfer was $10.  GOM subsequently conveyed another **21.162** acres of the surrounding Gainesville Land to GRE, by an amended deed dated October 27, 2004.  Plaintiff's Exhs 73 &. 74.  The consideration recited for the transfer was $10.  Thus, GRE, as of late October 2004, had approximately 40 acres of the surrounding Gainesville Land (*i.e.,* 1.686 acres plus 17.163 acres plus 21.162 acres).

     (g)  <u>REI Conveyance (*i.e.,* Conveyance from GRE to a Subsidiary of CabelTel/Greenbriar of GRE's Control/Ownership in Gainesville Mall) for Ambiguous Reasons and Consideration</u>. Recall that by a deed dated August 11, 2004, GOM conveyed the 41.7 acres of land constituting the Gainesville Mall to an entity called Gainesville Property, LP, that Debtor (through GRE) 51% owned.  As it turns out, roughly three months later, this status quo changed.  Real Estate Investors, LLC ("REI") is a subsidiary of Greenbriar/CabelTel, which is, of course, the Debtor's employer.  On November 1, 2004, the Debtor's indirect subsidiary, GRE, entered into a Sale Agreement with REI, pursuant to which GRE conveyed to REI its 49% limited partnership interest in Gainesville Property, LP and 100% of its membership interest in Gainesville Partners, LLC (the later of which, as set forth earlier, is the general partner and 2% owner of Gainesville Property, LP).  Plaintiff's Exh. 41.  Thus, control and the 51% majority ownership of the Gainesville Mall that had gone indirectly to the Debtor (*i.e.,* to GRE) from GOM (Greenbriar/CabelTel's wholly owned subsidiary) in August 2004, went right back to the Debtor's employer (*i.e.,* an entity it controls—REI) a mere three months later.  Why?  The reason is somewhat ambiguous.  The REI Sale Agreement recited that Greenbriar "loaned sums to [GRE] to purchase certain real estate assets" and that GRE desired to convey its interest in the entities owning such real estate" to Greenbriar "in satisfaction of such loan."  Plaintiff's Exh. 41.  Plaintiff takes the position that there was no loan made by Greenbriar to GRE.  There appears to be no evidence in the record of the "loaned sums" mentioned.  The Debtor has testified that he does not know much

about what this transaction was all about and that he signed
"whatever was sent." He testified that he believed there was a
letter agreement regarding this transaction, but he did not have
a copy of it. The wording of this Sale Agreement (Plaintiff's
Exh. 41) suggests (albeit not with great clarity) that Greenbriar
extended credit to GRE to purchase its indirect 51% interest in
the Gainesville Mall and now, in discharge or satisfaction of
this credit, Greenbriar was taking the Gainesville Mall back. It
is not farfetched to believe Mr. Morgan told the truth – in
saying he did not know much about the details of this transaction
– since it is certainly apparent from the overall record in this
case that real properties and lending obligations went from
entity-to-entity-to-entity (presumably for all sorts of tax,
liability, financing, and other business reasons) and so it does
not strain credibility to believe that Mr. Morgan was fuzzy on
the details or motivation for this particular transaction.[17]

      (h) <u>GRE's Subsequent Conveyance of 6.0 Acres of its 40
Acres of Gainesville Land to Thomasville Investments.</u> On the
same day as the REI Conveyance, GRE conveyed 6.0 acres of the
approximately 40 acres of Gainesville Land it owned to
Thomasville Investments, by deed dated November 1, 2004.
Plaintiff's Exh. 78. The consideration recited for the transfer
was $10. The Debtor testified that this land was donated for
purposes of a theater.

      (i) <u>GRE's Subsequent Conveyance of 32 Acres of the
Gainesville Land to TacCo.</u> Next, GRE subsequently conveyed 32
acres of the Gainesville Land (consisting of the 17.163 acre
parcel plus the 21.162 parcel, less the 6 acres transferred to
Thomasville) to TacCo (in the so-called "TacCo Conveyance"), by
deed dated December 14, 2004. Plaintiff's Exh. 79. More
specifically, the Debtor and GRE enter into an agreement with
TacCo on December 14, 2005, wherein they conveyed
Greenbriar/CabelTel common stock owned by GRE, the
Greenbriar/CabelTel warrants and options owned by the Debtor, and
32 acres of GRE's Gainesville Land to TacCo in exchange for a
$3,283,900 credit against the indebtedness owed to TacCo under
the consolidated note ($2,497,307 of this credit was associated
with the land conveyed and $730,474.50 of this credit was
associated with the Greenbriar common stock conveyed). Debtor
has testified that he does not know what the land and stock were
actually worth, but says it had to be done because TacCo called
the notes and was taking the position that whatever the Debtor

---

[17] As noted earlier, the court found Mr. Morgan to be at all times
credible and straightforward in answering questions.

made or had must go to TacCo.[18]

        (j)  <u>GRE's Remaining 1.686 Acres of Gainesville Land.</u>
There is a mystery with regard to the title trail on the
remaining 1.686 acres of Gainesville Land that GRE acquired from
GOM by an amended deed dated September 17, 2004.  Plaintiff's
Exh. 71.  By deed dated September 16, 2005 (*postpetition*), TacCo
conveyed this land to CBOCS ("Cracker Barrel").  Plaintiff's Exh.
80 & 86.  The testimony at trial indicated that the purchase
price paid by Cracker Barrel was $393,000.  However, there is no
evidence of any deed of this particular land parcel from GRE to
TacCo and Debtor does not have any explanation for how and when
GRE conveyed this land to TacCo (it was not conveyed along with
the 32 acres mentioned above).

      This court must analyze whether the above complex

transactions, singly or in the aggregate, constituted the

transferring or concealing of property of the Debtor, with an

intent on the part of Mr. Morgan to hinder, delay, or defraud a

creditor.   11 U.S.C. § 727(a)(2).  It seems apparent that value

flew both on and off the Debtor's balance sheet within a year of

the filing of his bankruptcy case.  Most significantly, value was

eroded in connection with:  (i) the September 1, 2004 TacCo

Consolidation Agreement when the Debtor's and GRE's assets were

pledged to TacCo; (ii) the Gainesville Hospitality sale when

$213,000 of sale proceeds that would have gone to GRE instead

went to TacCo; (iii) the November 2004 REI Conveyance, in which

the Debtor's 51% indirect interest in the Gainesville Mall was

returned back to the Greenbriar/CabelTel enterprise;  (iv) the

6.0 acres of land that GRE donated to Thomasville for the theater

---

[18]  The Debtor presented evidence that the CabelTel warrants were
canceled by CabelTel and became worthless following the transfers to
TacCo.

in November 2004; (v) the December 2004 TacCo Conveyance
(pursuant to which 32 acres of land and the Greenbriar/CabelTel
common stock were conveyed from GRE to TacCo as a pay down on the
TacCo debt); and (vi) in connection with the 1.686 acres of land
(for which there is no document trail from GRE to TacCo) which
was conveyed by TacCo to Cracker Barrel postpetition for
$393,000.

Clearly, it appears as though there are grounds for
asserting chapter 5 causes of action here against certain
parties.  While the chapter 5 causes of action are not, in every
situation, crystal clear (for example, in the case of transfers
of property of GRE, as opposed to transfers of property of the
Debtor), as previously stated, clearly value was flying off the
Debtor's balance sheet - in some cases directly and in other
cases indirectly (such as when the Debtor's indirect subsidiary,
GRE, lost assets/value).  However, transfers are one thing, and
the Debtor's *intent* is quite another thing.[19]  *In re Pratt*, 411
F.3d 561, 565 (5th Cir. 2005).  "The intent to defraud must be
actual, not constructive."  *Id.*  This court does not believe that
there was an intent on the part of the Debtor to defraud
creditors in the above series of complex transactions.  The court
believes that Greenbriar/CabelTel and TacCo, in particular, were
most definitely out to protect their own interests (although they

---

[19] In fact, this is why there is such a concept as "constructive"
fraudulent transfers.  11 U.S.C. § 542(a)(1)(B).

-36-

may have been perceived as "friendly" with the Debtor). TacCo
appears to have grabbed whatever it could, whenever it could, to
satisfy its acquired, consolidated claims against the Debtor.
The court believed the Debtor when he said that TacCo was taking
the position that whatever the Debtor made or had must go to
TacCo. TacCo was owed $15 million. Clearly, the record reflects
that this was the path TacCo was taking. But the court believes
that the Debtor wanted the Gainesville project for himself, and
it was only because he could not do it alone, that he went to
friendly parties, Greenbriar/CabelTel, to find a way to make the
project happen. The parties negotiated a mutually beneficial
arrangement for Mr. Morgan to get a good income, plus a share of
the upside (through the stock, warrants, and options) and even a
share of the property. But ultimately, TacCo would not let the
Debtor get too much, because TacCo was owed too much. The court
finds no fraudulent intent on the part of the Debtor with regard
to these transactions. TacCo's collection efforts, on the other
hand, may not pass muster under a constructive fraudulent
transfer analysis - if such an analysis is ever presented.

In summary, the Gainesville property and TacCo transactions
outlined above do not demonstrate, by a preponderance of the
evidence, intent on the part of the Debtor to transfer or conceal
assets.

2.  <u>Personal Transactions Alleged to be Fraudulent.</u>

Between November 2002 and the May 2, 2005 Petition Date, certain transactions involving the Debtor's personal and family affairs took place that Plaintiff believes implicate Section 727(a)(2).

(a)  <u>The Lake House</u>.  On June 7, 2000, the Debtor and Mrs. Morgan (before the decline in Mr. Morgan's real estate business), purchased a five bedroom lake house in Henderson County, Texas (the "Lake House").  Plaintiff's Exh. 10.  The court takes judicial notice that the Lake House is valued at $366,000 on the Debtor's Schedules filed in the bankruptcy case, with $301,786 of secured indebtedness against it; thus, there appears to be about $65,000 of equity potentially for the estate (if the Lake House were found to be property of the estate). However, on November 6, 2002 (*approximately two and one-half years before the Debtor's bankruptcy filing*), the Debtor transferred his interest in the Lake House to Mrs. Morgan by a Quitclaim Deed filed almost immediately in the public records of Henderson County, Texas on December 4, 2002.  Plaintiff's Exh. 11.  The Plaintiff argues that, although this transfer was outside of the one-year time frame contemplated by Section 727(a)(2), that the doctrine of "continuing concealment" should be applied by the court here, since the Debtor continued to have use of the property within one year of the bankruptcy filing.[20] The Debtor candidly admits he did not receive a cash payment or other direct consideration from Mrs. Morgan at the time of the transfer.  The Debtor also candidly admits that, up to and during the bankruptcy, he had continued use and enjoyment of the Lake House.

(b)  <u>Family Leasing</u>.  Family Leasing is an entity that, from its formation in 2000, was owned 99% by the Debtor and Maria Morgan (collectively, as husband and wife), and 1% by Tara Group. Then, on September 30, 2004, within a year of his petition date, the Debtor transferred, and caused Tara Group to transfer, all of their membership interests in Family Leasing to Maria Morgan for $1.00.  As a result of that transfer, Maria Morgan became the sole member and owner of Family Leasing.

---

[20] Mrs. Morgan paid all the bills for the Lake House from her personal bank account.

When the transfers occurred, it appears that Family Leasing was worth nothing or almost nothing. At the time of such transfers, the only assets owned by Family Leasing were beneficial interests in two trusts (the Tarrant County Land Trust and the Tarrant County Land Trust II, created July 20, 2004), each of which had been formed to acquire houses in Tarrant County, Texas, from owners who had been unable to sell their houses for an amount in excess of their mortgage debt. The way this business was structured to work was as follows: a land trust would be formed to acquire a house, the consideration for which would be for the trust to agree to pay the mortgage debt against the property. The land trusts did not assume the mortgage indebtedness. Each land trust then leased the house to a tenant at a monthly rental approximating the amount of the monthly mortgage payment. The lease granted the tenant an option to purchase the property during a specified period at an option price that declined as monthly rentals were paid. Neither Mr. Morgan, his wife, Family Leasing, nor the land trusts contributed or expended any funds to acquire the houses. The value of each of the two houses owned in September 2004 was equal to or less than the debt against such house, as evidenced by the former owner's inability to sell such property for an amount in excess of the mortgage debt and such former owner's willingness to enter into the described transaction with the land trust. In any event, not only did the Debtor list Family Leasing on his Schedule B as an asset in which he had a community interest,[21] as

---

[21] Later, after the transfer (on March 1, 2005), Family Leasing acquired one more asset: a consulting contract with Greenbriar/CableTel (in connection with the Gainesville Mall transactions), pursuant to which Family Leasing receives $12,200 per month. Family Leasing does not have any employees to do the consulting. The Debtor provides services to Greenbriar/CableTel, through Family Leasing. The evidence was that the $12,200 per month that Family Leasing gets paid from Greenbriar/CableTel in connection with the consulting agreement ultimately gets deposited in Mrs. Morgan's personal bank account. The evidence also was that this Family Leasing consulting agreement replaced a prior consulting agreement between Tara Management, Inc. and Greenbriar dated September 1, 2003, that had a term for five years and provided for $180,000 per year to go to Tara Management, Inc. Since the Debtor owns indirectly Tara Management, Inc., it appears that when the consulting agreement was put into Family Leasing's name, the net effect was, arguably, to deprive the Debtor's estate of $180,000 per year of value for about 3 more years. But this is probably theoretical more than anything else, since this is a pre-BAPCPA chapter 7 case, and postpetition earnings are not property of the estate (and what we are talking about, essentially, is Debtor's postpetition earnings, since he is the one doing the consulting). The Debtor, of course, cannot be forced to continue to provide consulting services for the benefit of his

if the transfer in September 2004 had not even occurred, but he listed the value at $27,000 on his Schedule B.[22]

(c) <u>Bank Accounts</u>. The Debtor is a co-trustee of the Morgan Family Trust (the "Family Trust"). The Debtor and Maria Morgan established the Family Trust on December 22, 2003. The names on three (3) of the Debtor's bank accounts were changed to be in the name of the Family Trust in the months prior to the Petition Date. The names on Chase Bank bank account number 087-0261-0889 were changed from the Debtor and Maria Morgan to the Family Trust beginning with the statement dated February 19, 2004. Similarly, the names on Northern Trust bank account numbers 1080456 and 2052314 were changed from the Debtor and Maria Morgan to the Family Trust beginning with statements dated February 17, 2004, and March 31, 2004, respectively.

(d) <u>Ski-Doos</u>. Title to certain water craft known as "Ski-Doos" was apparently transferred to the Family Trust five weeks before the Petition Date. The Debtor asserts that those transfers were not made with any actual intent to hinder, delay, or defraud any creditor. In any event, the Debtor has listed this property in his Schedule B as "community property" (valued at $2,500 each, for a total of $5,000) so, it appears to the court, that the Debtor is not pursuing a position that these Ski-Doos were transferred out of the reach of creditors.

(e) <u>Warwick - Allegations of Commingling of its Funds with Those of Debtor</u>. The Plaintiff complains that the Debtor was using one of the bank accounts of one of its entities, Warwick, for personal use. The evidence was that Warwick opened a checking account at Southwest Bank on March 20, 2003. The Debtor produced checking account records for this account (these checking account records are the only records Debtor has for Warwick). The Plaintiff complains that there are lots of large deposits and withdrawals for which the Debtor does not have a lot of explanation or records. The evidence was that the Debtor did

---

bankruptcy estate. The court also notes that all of this consulting income was listed in Debtor's Schedule I filed in his bankruptcy case. And, finally, as previously mentioned, the Debtor, despite the transfer, listed the equity in Family Leasing as community property, in his Schedules.

[22] The Debtor testified that subsequent to Debtor's bankruptcy filing, one of the rental properties owned by a land trust was reconveyed to the sellers because the land trust's tenant had moved out, the land trust could not locate a new tenant, the property was not generating funds to pay the mortgage indebtedness, and the value of the property did not exceed the mortgage debt.

write some checks from the Warwick account to Maria Morgan to pay
household bills.  The Debtor paid for a roof on the house on
Holly Tree Drive with a check from the Warwick account.  The
Warwick bank account statements reveal transfers from that
account totaling $206,457.40 to Maria Morgan between August 2003
and April 2005.  However, the evidence also was that from
September 2003, the Debtor deposited into the Warwick account the
consulting fees paid by Greenbriar/CabelTel to Tara Management
under the Tara Management Consulting Agreement.  (Tara Management
does not have its own bank account.)  The fees were first
deposited into Warwick account then paid to Maria Morgan.

With regard to the personal/family transactions outlined
above, the court turns again to the language of Section
727(a)(2), and the cases interpreting it.  "The court shall grant
the debtor a discharge, unless the debtor, with intent to hinder,
delay, or defraud a creditor or an officer of the estate charged
with custody of property under this title, has transferred,
removed, destroyed, mutilated, or concealed, or has permitted to
be transferred, removed, destroyed, mutilated, or concealed
property of the debtor, within one year before the date of the
filing of the petition."  11 U.S.C. § 727(a)(2)(A).  In order to
establish that a debtor's general discharge should be denied
pursuant to section 727(a)(2)(A), the moving creditor must show
(1) a transfer or concealment of property; (2) belonging to the
debtor; (3) within one year of the filing of the petition; and
(4) with intent to hinder, delay or defraud a creditor or officer
of the estate.  *In re Pratt*, 411 F.3d 561, 565 (5th Cir. 2005).
"The intent to defraud must be actual, not constructive."  *Id*.
But actual intent may be inferred from the actions of the debtor

and may be proved by circumstantial evidence. *Id*.

The Fifth Circuit has set forth factors that may show actual intent to defraud: (i) inadequate consideration; (ii) the family, friendship or close association between the parties; (iii) the retention of possession, benefit or use of the property in question; (iv) the financial condition of the party sought to be charged both before and after the transaction in question; (v) the existence or cumulative effect of the pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (vi) the general chronology of the events and transactions under inquiry. *In re Pratt*, 411 F.3d at 565 (*citing Peavy v. Chastant (In re Chastant)*, 873 F.2d 89 (5th Cir. 1989)); *In re Dennis*, 330 F.3d 696, 702 (5th Cir. 2003). "[M]oreover, a presumption of fraudulent intent [attaches] when a debtor transfers property to relatives." *In re Pratt*, 411 F.3d at 565-66. "[O]nce this presumption attaches, the burden shifts to the debtor" to show that there was no fraudulent intent. *Id*. at 566.

Since the transactions above involve transfers to family members or family entities/trusts at a time when the Debtor was in financial distress, this court concludes that a presumption of fraudulent intent has arisen that shifts the burden to Mr. Morgan to show there was, in fact, no fraudulent intent with regard to the transactions.

First, with regard to the Lake House, the analysis is slightly more complicated than the analysis with regard to the other transactions, because it occurred *more* than one year before the bankruptcy.  The Plaintiff relies on the Fifth Circuit case of *Olivier* to argue for denial of discharge pursuant to section 727(a)(2)(A).  *Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550 (5th Cir. 1987).

In the *Olivier* case, the debtors' son was in an automobile accident in 1978 in a car owned by the debtors in which another individual was severely injured.  *Id*. at 551.  Two days after the accident, the debtors transferred record title of their house for $15,000 cash to the debtor-husband's mother.  *Id*.  The debtors apparently returned the $15,000 a few days later.  *Id*.  The debtors continued to live in the house, maintained the house, paid insurance on the house, and did not pay rent on the house. *Id*.  In 1979, judgment was entered against debtor-husband in a personal injury suit arising from the son's accident in an amount in excess of $100,000.  *Id*.  The debtors' liability insurance paid $5,000.  The debtors filed bankruptcy in 1985.  *Id*.

In *Olivier*, the debtors' discharge was denied by the bankruptcy court, pursuant to Section 727(a)(2), and the decision was affirmed through the Fifth Circuit.  The reason for the denial of discharge was that, although the transfer of the house occurred more than one year prior to the petition date, the

-43-

debtors continued to use and benefit from the property and such continued use and benefit constituted continued concealment of a secretly retained interest in the property. *In re Olivier*, 819 F.2d at 555. Moreover, regarding intent, the debtors admitted that the reason they transferred the property was to protect the property from an eventual lawsuit. *Id*. at 552 n. 2. In fact, the debtor-husband testified that there was no other reason for the transfer. *Id*. The Fifth Circuit noted that "those who transfer property with [an intent to hinder, delay, or defraud creditors] may be reluctant to disclose their motivation," and, therefore "the intent to frustrate creditors can be inferred from conduct." *Id*. at 552. Retention of the use of the transferred property is a strong indication of fraudulent intent. *Id*. However, such indication is not conclusive. For instance, where the debtor assigned his mortgages to his mother, without consideration, eighteen months before filing bankruptcy, and with her agreement to hold the funds for his use and benefit, in absence of evidence to the contrary, such transfer could not be treated as concealment because the transfer was made in repayment of a loan to the debtor from his mother. *In re Stookey*, 60 F.2d 972 (W.D.N.Y. 1932) (cited in footnote 6 of the *Olivier* opinion). "[M]erely continuing to live on the property is insufficient to prove a secret interest." *In re Hooper*, 274 B.R. 210, 216 (Bankr. D. S.C. 2001). "To meet the burden of proving a secret

-44-

interest by a preponderance of the evidence, [the objecting creditor] must show something more than [the debtor] continuing to live on the real property." *Id*. at 217.

The Plaintiff urges that the *Olivier* case necessitates that this court find that the continuing concealment doctrine applies to the Lake House because, after the transfer of his interest to Mrs. Morgan in 2002, Mr. Morgan still enjoyed the use of the Lake House. But the *Olivier* case and the other authority cited above, in fact, suggest that continuing use is not conclusive. Here, there are facts not present in *Olivier* that override the presumption of fraudulent intent and continuing concealment.

Mr. Morgan testified in a way that overcame the presumption of fraudulent intent. He testified that the transfer of the Lake House was done for the following reasons. First, for repayment of a postnuptial debt he owed to his wife - namely for $65,000 of her separate property she expended in support of the couple. Mr. Morgan testified that, at the time of the transfer, Mrs. Morgan had taken considerable money out of her pre-marriage funds to keep them going during their hard financial times and that, in return, he gave her his equity interest in the house. While there was no documentation submitted to unequivocally establish that Mrs. Morgan spent her separate property to support the family, there was evidence that, during that time frame between 2002 and 2003, the Morgans were in such financial straits that

-45-

Mrs. Morgan obtained part time employment at The Gap. See
Defendant's Exh. 2, the Morgans' 2003 tax return. The Morgans'
2002 tax return, Defendant's Exh. 3, also reflects that the
Morgans took out $39,254 in IRA distributions. The Morgans'
wages, salaries, and tips dipped from $220,200 in 2001 (see
Defendant's Exh. 4, the Morgans' 2001 tax return) to $74,300 in
2002 (see Defendant's Exh. 3). Money to support the family had
to come from somewhere and, despite a lack of a clear paper
trail, this court finds credible Mr. Morgan's testimony
(supported by the tax returns) that, indeed, at least one of
those places was Mrs. Morgan's separate property (*i.e.,* IRA
distributions and her wages from The Gap).

A second reason given by Debtor for why the Lake House was
transferred to Mrs. Morgan was so that she could refinance the
property (because his credit was in shambles following the
meltdown of his businesses) to obtain funds to (a) pay a short-
term $17,000 loan from South West Bank that had been extended
approximately eight months earlier, the proceeds of which were
used to satisfy and obtain the release of a Henderson County
judgment entered against Debtor and his spouse in favor of the
property's prior owners in a lawsuit arising on account of a dock
built by the prior owners, (b) pay real estate taxes that were
assessed against the property, and (c) allow Debtor and his
spouse to obtain additional funds for living expenses.

This court believes Mr. Morgan's testimony and so finds that Mr. Morgan transferred his interest in the Lake House in 2002 to his wife in repayment for her use of her separate property to support the family during their difficult financial condition in 2002. Mr. Morgan's use and enjoyment of the Lake House owned by his wife was no different than his use and enjoyment of the Holly Tree Drive residence owned by Maria Morgan as her separate property since the inception of their marriage in 1994.

Next, with regard to Family Leasing, Mr. Morgan, once again, testified in a way that overcame the presumption of fraudulent intent. The Debtor testified that he conveyed his interests to Maria Morgan for $1.00 because it was "worth nothing," and because there were no assets there. The evidence supports this statement - the amount of value in Family Leasing is/was trivial compared to the millions of dollars involved in this controversy (diminishing the notion of intent to defraud). The Debtor also testified that he conveyed Family Leasing to Maria Morgan because Mrs. Morgan wanted to start a business of her own and create her own income. The purpose for the Family Leasing business was also to create an earning history for Mrs. Morgan for the purposes of her obtaining future eligibility for Social Security, Medicare and Medicaid. In any event, the court notes that the Debtor scheduled Family Leasing as an entity in which he has an interest in Schedule B - as though not regarded as transferred by the

-47-

Debtor.

Next, with regard to the bank accounts, the Debtor asserts
that the name changes on the bank accounts were made on the
advice of Debtor's estate planning attorney in conjunction with
the Debtor's execution of a new will on December 22, 2003. The
name changes on the bank accounts were made for the purpose of
enabling the bank accounts to pass to Debtor's wife, who is
approximately 15 years younger than Debtor, upon his death
without subjecting such accounts to the burdens and uncertainties
of probate proceedings.  This is a perfectly reasonable
explanation for the name changes.  However, a much simpler reason
keeps the bank account names changes from being grounds upon
which to deny the Debtor discharge:  the name changes and the
transfers occurred over one year prior to Mr. Morgan's petition
date of May 2, 2005, and the Plaintiff has failed to show that
any funds in those accounts remained in those accounts up to the
time of bankruptcy so that a continuing concealment type argument
clearly does not apply to those transfers.

Next, with regard to the "Ski-Doos," the court likewise
concludes that they were not transferred with the intent to
hinder, delay or defraud creditors such that the transfer does
not form the basis for denial of the Debtor's discharge pursuant
to section 727(a)(2).  The amounts were not only trivial in
comparison to the millions of dollars involved in this overall

-48-

controversy (diminishing the notion of intent to defraud) but the Ski Doos are listed in the Debtor's schedules as though not regarded as transferred by the Debtor.

Finally, with regard to the Warwick bank account, usage of it for personal expenses might suggest a reason to treat the Warwick account as an asset of the Debtor.  But the Debtor has produced all bank account records for it, and the records do not suggest anything other than the Greenbriar/CabelTel consulting fees were perhaps deposited into Warwick's account (rather than an account perhaps more appropriately in the name of Tara Management or Family Leasing), and then Mrs. Morgan used the funds to pay household expenses.  There is no evidence that there were transfers out of the Warwick account with fraudulent intent.

## H.  Debtor's Alleged Failure to Keep or Preserve Records from Which His Financial Condition or Business Transactions Might be Ascertained.

Section 727(a)(3) of the Bankruptcy Code provides that "[t]he court shall grant the debtor a discharge, unless the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."  11 U.S.C. § 727(a)(3).  "In order to state a prima facie case under [section] 727(a)(3), the party

-49-

objecting to discharge bears the initial burden to prove (1) that the debtors failed to keep and preserve their financial records and (2) that this failure prevented the party from ascertaining the debtors' financial condition. "Though a debtor's financial records need not contain 'full detail,' 'there should be written evidence' of the debtor's financial condition." *Martin Marietta Materials Southwest, Inc. v. Lee (In re Lee)*, 309 B.R. 468, 477 (Bankr. W.D. Tex. 2004) (Clark, J.) (*citing Robertson v. Dennis (In re Dennis)*, 330 F.3d 696 (5th Cir. 2003); *Goff v. Russell Co. (In re Goff)*, 495 F.2d 199 (5th Cir. 1974)). If the plaintiff meets its burden to make that *prima facie* case, the burden shifts to the debtor to show that the failure to keep adequate records was justified under all of the circumstances. *Id*. The bankruptcy court has wide discretion in determining the sufficiency of the records kept and preserved by the debtor. *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003).

> The purpose of section 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to a discharge. [Internal citation omitted.] The statute also ensures that the trustee and creditors are supplied with dependable information on which they can rely in tracing the debtor's financial history. Creditors are not required to risk having the debtor withhold or conceal asset 'under cover of a chaotic or incomplete set of books or records.'

*Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3rd Cir. 1992)

-50-

(*citing In re Cox*, 904 F.2d 1399 (9th Cir. 1990)).

It is undisputed that sometime in 2002 (approximately three years before filing bankruptcy; also prior to the Plaintiff's loan finally maturing or the litigation associated with Plaintiff's claims being commenced; also, indisputably after the foreclosures of the properties owned by the bulk of Debtor's companies had taken place), Mr. Morgan destroyed a large number of documents pertaining to some of his real estate business entities, which he had been keeping in a rented storage facility after closure of his business office space. Mr. Morgan candidly explained at trial that he had moved his personal office space twice and had kept three filing cabinets full of documents concerning various single asset real estate entities in this storage facility, thinking he might need them in the future. After the various properties owned by the myriad entities in which Mr. Morgan had an interest had been foreclosed upon, however, Mr. Morgan ultimately saw no need to continue to keep the documents so, with an eye simply toward saving money, he cleared the storage unit and destroyed the documents.

Plaintiff complains that the Debtor did not keep and preserve documents relating to Mr. Morgan's various real estate businesses. The Debtor scheduled and listed in his Statement of Financial Affairs 32 entities in which he had an interest. Plaintiff has, one-by-one, complained about such things as the

Debtor not producing loan documents and tax returns for certain
of these entities - most or all of which entities have been
defunct several years.  Mr. Morgan testified that, when he
received the Plaintiff's document request in connection with this
adversary proceeding, he went to a box at his home where he had
been storing certain documents relating to unresolved disputes,
then also went to the filing cabinets in a storage room at
Greenbriar/CabelTel and pulled documents he thought were relevant
and gave them to his counsel to tender to counsel for the
Plaintiff.  He testified that his wife also produced a box.  Mr.
Morgan asserts that he sent to the Plaintiff everything that he
had and emphatically denies that he destroyed or concealed
documents from his files so that the Plaintiff and its counsel
could not get a look at them.  The evidence further revealed that
Debtor produced to Plaintiff at least 12 boxes of documents and
records relating to his financial affairs and business
transactions, including Debtor's personal federal income tax
returns for the years 1994 through 2004, Debtor's bank account
statements, and Debtor's credit card statements and receipts.
Such records also included the closing binders for the
transactions relating to the TacCo debt consolidation and debt
reduction, which are also among Plaintiff's trial exhibits,
although the Plaintiff complains that the Mr. Morgan did not
produce all documents regarding the TacCo debt, which is the

single largest debt owed by the Debtor.

As mentioned, the records that are the subject of Plaintiff's complaint are, by and large, records pertaining to Debtor's companies, which are separate legal entities, and are not the Debtor's personal records. Moreover, most of the business records that are the subject of Plaintiff's complaint were records relating to activities and transactions that occurred several years prior to the filing of Debtor's bankruptcy case. Debtor's companies were not actively engaged in business activities after 2001 and therefore had few records to keep or maintain.

To the extent Debtor did not possess all of the records relating to his companies' business transactions, such records were not intentionally lost, destroyed, or mutilated by Debtor with the intent or purpose of concealing his financial condition and business transactions from creditors or his bankruptcy trustee. Rather, such records were not maintained or kept because (a) Debtor moved his office several times during the period from 2000 through 2005 and many records were lost or destroyed in the process of moving, (b) Debtor discontinued the storage unit in 2002 due to the cost of maintaining such unit and many records were destroyed, and (c) many of the financial records were maintained on a computer server to which the Debtor no longer has access. To the extent Plaintiff complains that

-53-

Debtor did not keep records relating to GRE's transactions regarding the Gainesville Mall acquisition, such records (a) were records of the Debtor's company and not Debtor's personal records, and (b) were available to Plaintiff because they were possessed by Debtor's employer, Greenbriar/CabelTel.

While it is true that a debtor's creditors are entitled to examine not just his own personal records, but those of his businesses – especially when those businesses are closely held – to require that a debtor keep such records indefinitely is onerous. Mr. Morgan's businesses ceased operation in 2001, falling victim to a series of foreclosures and other ill fortune that has left Mr. Morgan saddled with many millions of dollars in guaranty debt for several years. He filed bankruptcy in mid-2005. And he testified that he did, in fact, hold the records for a period of time but, in 2002, he destroyed them after the properties had been foreclosed upon, seeing no practical need to keep documents relating to failed businesses any longer and seeking to save himself and his family money. This is not a case of a debtor destroying records in contemplation of bankruptcy to frustrate creditors. This Debtor, in winding down his business life (arguably for the last time, since Mr. Morgan was, at the time, and is, now, of retirement age) three years prior to the filing of a bankruptcy petition, destroyed documents relating to dead business enterprises. Destruction of business records by a

defunct business is neither unusual nor shocking, and the timing of the disposal of the records does not lend itself to a presumption of a sinister motive. Mr. Morgan turned over bank accounts, tax returns, and 12 boxes of whatever other records he had in his possession at the time of bankruptcy. This court cannot find, therefore, that this Debtor failed to keep and maintain financial records within the contemplation of section 727(a)(3), just because he failed to maintain indefinitely records of businesses that had closed down several years prior to bankruptcy. Plaintiff fails to show that Debtor's personal financial condition or personal business transactions might have been better ascertained from these records. The court notes that the documentary evidence in this matter has been quite voluminous without the "missing" records of remote entities. Accordingly, this court will not deny Mr. Morgan's discharge pursuant to section 727(a)(3).

## IV.
## CONCLUSION

Based upon the foregoing, Plaintiff's objections to Mr. Morgan's discharge are OVERRULED in their entirety. A separate judgment will be entered for the Defendant in this matter.

###END OF MEMORANDUM OPINION###